Filed 7/31/14  In re Daniella G. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re DANIELLA G., a Person Coming Under the Juvenile Court Law. | B252572 (Los Angeles County Super. Ct. No. CK84435) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. KAREN A., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge.  Affirmed.

Eva E. Chick, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

Karen A. (Mother) appeals from the juvenile court's order summarily denying her petition under Welfare and Institutions Code section 388.[1] She contends that the court erred in denying the petition and deprived her of her right to due process by failing to hold a hearing on the petition. Mother also challenges the court's finding that the parental relationship exception found in section 366.26, subdivision (c)(1)(B)(i) did not apply to preclude the termination of her parental rights. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

*Detention*

Mother has two children, Daniella G. (born Nov. 2008) and Dominic A. (born Sept. 2010).[2] Daniella's father, Paul G. (Father), is not a party to this appeal. The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in September 2010, because Mother tested positive for amphetamines when she gave birth to Dominic. Mother admitted using crystal methamphetamine during the previous year while she was pregnant. The caseworker placed a hospital hold on Dominic and temporarily detained Daniella.

---

[1]  All undesignated statutory references are to the Welfare and Institutions Code.

[2]  Dominic has a different father than Daniella and is not a subject of this appeal.

*Jurisdiction*

DCFS filed a section 300 petition, asserting jurisdiction under section 300, subdivisions (a) and (b).[3] The petition alleged that domestic violence between Mother and Father and drug use by both parents placed the children at risk. The juvenile court ordered the children detained and ordered drug testing, referrals to programs, and monitored visits for Mother.

DCFS prepared a jurisdiction/disposition report for a November 15, 2010 hearing.[4] The children were detained with Maternal Aunt. DCFS had conducted a due diligence search for Father but was unable to locate him, and Mother did not know his location.

Mother reported that Father had been violent with her during their relationship, often shoving her into the wall, slapping her face, and pulling her hair. She had never reported his abuse to the police because he threatened to hurt her if she did. Mother said that Father had never been involved in Daniella's life, and that she had not seen him since Daniella was one year old.

Mother admitted drinking alcohol and using crystal methamphetamine while she was pregnant with Dominic. She began experimenting with marijuana and alcohol at the age of 11 and was using marijuana, alcohol, and methamphetamine by the age of 13. Her parents attempted to intervene, but she refused to participate in drug treatment. She and Father used methamphetamine regularly. She admitted using methamphetamine during her pregnancy with Dominic and a few days before

---

[3]    The petition was filed on behalf of both Daniella and Dominic, but this appeal concerns only Daniella.

[4]    In November 2010, DCFS filed an amended section 300 petition, adding allegations regarding both fathers.

3

his birth, but she did not think the drugs would affect him because she "did not use drugs a lot."

Maternal Grandmother stated that she and Maternal Grandfather had denied Mother permission to have a relationship with Father, but Mother used to sneak out of the house to meet him.[5] Maternal Grandmother also stated that Mother had completed one substance abuse program when she was 13 years old, but she began using drugs again after meeting Father when she was 16 years old.

In a November 15, 2010, Last Minute Information for the Court, DCFS reported that Mother tested positive for methamphetamine on November 2, 2010.

In a supplemental report, DCFS stated that Mother had enrolled in an outpatient substance abuse program and parenting classes on September 30, 2010. However, she was terminated from the program after she tested positive for methamphetamine, missed several weeks of parenting classes, and failed to return telephone calls. Mother enrolled in an inpatient substance abuse program on December 7, 2010.

The juvenile court sustained the allegations in the section 300 petition regarding violent altercations between Mother and Father, both parents' drug use, and Father's failure to provide the necessities of life. The court ordered DCFS to assess the maternal grandparents for placement and to determine whether the children could be placed with Mother at her program. The court continued the disposition hearing to February 2011.

DCFS stated in a supplemental report that Mother entered a substance abuse program on December 7, 2010, and was in the first of the program's six phases. All seven of her drug tests taken for her program and for DCFS were negative.

---

[5] Mother was born in 1992 and therefore was 16 years old when Daniella was born.

4

Her counselor reported that Mother was receptive to the program and motivated to resolve her issues. DCFS recommended continued placement of the children with Maternal Aunt, unmonitored visits at Mother's program and monitored visits outside her program.

*Disposition*

At the February 2011 disposition hearing, the juvenile court ordered continued counseling services and family reunification services for Mother, and unmonitored visits at her program and monitored visits outside her program.

The children were placed with the maternal grandparents in April 2011 and were doing very well there. An August 2011 report stated that Mother had monitored visits about three times a week. Maternal Grandmother stated that Mother was very attentive during the visits and that the children were very bonded to Mother and happy to see her.

Mother discontinued her inpatient program on February 23, 2011. She stated that she planned to comply with the case plan, but she could not afford the programs to which DCFS referred her.

On August 15, 2011, the juvenile court again ordered family reunification services. The court found Mother to be in partial compliance with the case plan and ordered DCFS to help her enter another drug program.

DCFS submitted a status review report in February 2012, in which it reported that Mother was not in compliance with the case plan. Mother had been incarcerated in December 2011 and had not taken drug tests or participated in any drug program since February 2011. Mother told the caseworker that she wanted custody of her children, but she could not afford to participate in the required classes. Maternal Grandmother stated that Mother did not have a residence and

lived with various friends, relatives, or her boyfriend. The children continued to do well with the maternal grandparents.

In an interim review report in March 2012, DCFS stated that Mother continued to have an unstable lifestyle, living with different friends and not participating in any programs. Mother visited the children on a weekly basis. The children continued to do well in their placement, and the maternal grandparents were willing to adopt them. Mother told the caseworker that she would like her parents to adopt them if she could not regain custody.

In March 2012, the juvenile court found that Mother was in partial compliance with the case plan, terminated family reunification services for Mother, and scheduled a section 366.26 hearing. DCFS prepared a report for the section 366.26 hearing, in which the caseworker recommended terminating Mother's parental rights. The caseworker reported that Mother had visited the children "sporadically" for the previous seven months but continued to have only monitored contact with them. The caseworker stated that Mother "demonstrates a lack of willingness and ability to parent the two small children," and that the children were in need of legal permanence.

In September 2012, Maternal Grandmother told the caseworker that Mother was incarcerated and would be released in December 2012. Maternal Grandmother reported that Mother's visits with the children were good, but that Mother continued to have an inappropriate lifestyle. According to Maternal Grandmother, Mother did not have a residence and associated with "the 'wrong crowd.'" The caseworker stated that the children were bonded with the maternal grandparents.

DCFS filed a status review report in September 2013. Mother had been providing negative drug tests since her release from jail in December 2012. She

6

was participating in drug counseling and did not appear to be under the influence. She was appropriate with the children and had made progress, but she agreed with the adoption plan.

*Section 388 Petition*

Mother filed a section 388 petition in October 2013, asking the court to reinstate family reunification services and permit unmonitored visits. She stated that she had completed her substance abuse program and parenting classes, consistently provided negative drug tests, and visited Daniella three to four times a week. She argued that a continued relationship with her would be in Daniella's best interest because of their bonded relationship. Mother stated that she had resolved all the issues that led to Daniella's detention. She attached documentation of her completion of substance abuse, family reunification, and parenting classes. The letter of completion written by Mother's "Recovery Specialist" stated that Mother enrolled in the substance abuse program on January 23, 2013, and "attended 24 of 24 groups, and 24 of 24 individual sessions, 33 of 24 [*sic*] self-help meetings, and was tested 11 times all with negative results." The letter further stated that Mother was "taking responsibility for her actions" and "showed a strong desire to improve her attitude and behavior by learning how to break old habits that came with her addictions." Finally, it stated that Mother had "made a commitment to continue her self-help meetings."

The juvenile court denied Mother's section 388 petition without holding a hearing on the basis that the petition was untimely. The court noted that the information relied upon in the petition was from May, June, and August of 2013. The court further stated that, because the section 366.26 hearing was being held, it

7

was not in the child's best interest to grant the petition. The court then proceeded to the section 366.26 hearing.

*Section 366.26 Hearing*

Mother testified that she lived with and cared for Daniella for a year-and-a-half before DCFS intervened. Mother had been incarcerated for six months and was released in December 2012, approximately one year prior to the hearing. During her incarceration, her daughter sent her letters and spoke with Mother on the phone.

Prior to and after her incarceration, Mother visited Daniella four times a week for about four to five hours each visit. Mother testified that Daniella became excited and happy each time Mother visited, and she cried and asked Mother not to leave at the end of the visits. Mother stated that Daniella turned to her for comfort, not to Maternal Grandmother. Mother attended Daniella's school functions and medical appointments with Maternal Grandmother. Mother testified that she and Daniella were close and bonded, and that she would be able to support Daniella because she had a job. Mother conceded that her parents had bonded with Daniella and provided her a loving and stable home, but she stated that Daniella preferred being with Mother.

Maternal Grandmother testified that Mother's relationship with Daniella was very good because Mother had devoted quality time to her. Daniella told Maternal Grandmother that she loved Mother, but Maternal Grandmother believed that Daniella would have more stability with her grandparents than with Mother. Maternal Grandmother therefore believed adoption was in Daniella's best interest.

The juvenile court reasoned that the grandparents had provided Daniella a stable home and wanted to adopt her, and that, a month prior to the hearing,

8

Mother stated that she wanted the grandparents to adopt Daniella. The court further reasoned that, although Mother had been involved in Daniella's life, Maternal Grandmother had been her primary caregiver, and that Daniella needed permanency. The court thus found that Daniella was adoptable and that it would be detrimental for her to be returned to Mother and terminated Mother's parental rights. Mother timely appealed.

## DISCUSSION

I. *Denial of Section 388 Petition*

Mother contends that the juvenile court abused its discretion in denying her section 388 petition. "Section 388 permits '[a]ny parent or other person having an interest in a child who is a dependent child of the juvenile court' to petition 'for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court' on grounds of 'change of circumstance or new evidence.' (§ 388, subd. (a).)" (*In re Lesly G.* (2008) 162 Cal.App.4th 904, 912.) The petitioner must "establish[] by a preponderance of the evidence that (1) new or changed circumstances exist, and (2) the proposed change would promote the best interest of the child. [Citation.] The parent bears the burden to show both a '"legitimate change of circumstances"' and that undoing the prior order would be in the best interest of the child. [Citation.]" (*In re S.J.* (2008) 167 Cal.App.4th 953, 959.) "The change in circumstances or new evidence must be of such significant nature that it requires a setting aside or modification of the challenged order. [Citation.]" (*In re A.A.* (2012) 203 Cal.App.4th 597, 612 (*A.A.*).)

"In evaluating whether the petitioner has met his or her burden to show changed circumstances, the trial court should consider (1) the seriousness of the problem which led to the dependency, and the reason for any continuation of that

problem; (2) the strength of relative bonds between the dependent children to both parent and caretakers; and (3) the degree to which the problem may be easily removed or ameliorated, and the degree to which it actually has been. [Citation.]" (*A.A.*, *supra*, 203 Cal.App.4th at p. 612.)

Where, as here, reunification services have been terminated, "'the parents' interest in the care, custody and companionship of the child are no longer paramount. Rather, at this point "the focus shifts to the needs of the child for permanency and stability" [citation], and in fact, there is a rebuttable presumption that continued foster care is in the best interests of the child. [Citation.] A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child.' [Citation.]" (*In re Brittany K.* (2005) 127 Cal.App.4th 1497, 1505.)

"We review the grant or denial of a petition for modification under section 388 for an abuse of discretion. [Citations.] While the abuse of discretion standard gives the trial court substantial latitude, '[t]he scope of discretion always resides in the particular law being applied, i.e., in the "legal principles governing the subject of [the] action . . . ." Action that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an "abuse" of discretion. [Citation.]' [Citation.]" (*In re B.D.* (2008) 159 Cal.App.4th 1218, 1228.)

At the October 2013 hearing, the juvenile court stated that Mother's section 388 petition was untimely because the information in the petition was from May, June, and August of 2013. Mother contends that "a [section 388] petition may be filed at any time before the section 366.26 hearing . . . ." (*In re Baby Boy L.* (1994) 24 Cal.App.4th 596, 609.) While this may be true, Mother filed her section 388

petition on October 21, 2013, on "the eve of [the] section 366.26 hearing, [when] the child's interest in stability is the court's foremost concern, outweighing the parent's interest in reunification." (*In re Ramone R.* (2005) 132 Cal.App.4th 1339, 1348.) Thus, although the petition was not technically untimely, the juvenile court did not abuse its discretion in taking into consideration the lateness of the filing.

Mother also contends that the juvenile court abused its discretion by failing to consider her evidence that she had completed a drug program, parenting program, and family reunification program, and that she was bonded to her daughter. Mother also contends that the juvenile court denied the section 388 petition because the court was about to hold the section 366.26 hearing.

We acknowledge our Supreme Court's admonition that "section 388 serves as an 'escape mechanism' to ensure that new evidence may be considered before the actual, final termination of parental rights. [Citation.] It 'provides a means for the court to address a legitimate change in circumstances' and affords a parent her final opportunity to reinstate reunification services before the issue of custody is finally resolved. [Citation.] Section 388 is central to the constitutionality of the dependency scheme. [Citation.]" (*In re Hunter S.* (2006) 142 Cal.App.4th 1497, 1506 (*Hunter S.*), citing *In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) Because of section 388's role as an escape mechanism prior to a section 366.26 hearing, the juvenile court abused its discretion in relying solely on the fact that the section 366.26 hearing was about to be held as the basis for denying Mother's petition. (See *Hunter S.*, *supra*, 142 Cal.App.4th at p. 1506 [citing section 388's "critical role in the dependency scheme"].)

However, even if the lower court's reasoning in denying the section 388 petition was "incorrect in some regard, it is the action, not the reasoning, that we review. [Citation.]" (*In re Roberto C.* (2012) 209 Cal.App.4th 1241, 1256, fn. 8.)

11

As discussed below, we conclude that Mother failed to meet her burden of showing changed circumstances, and that the proposed change would be in Daniella's best interest. For this reason, any error in the lower court's reasoning was harmless. (See *In re James F.* (2008) 42 Cal.4th 901, 918 ["If the outcome of a proceeding has not been affected, denial of a right to notice and a hearing may be deemed harmless and reversal is not required."]; *In re Iris R.* (2005) 131 Cal.App.4th 337, 343 [due process error subject to harmless error analysis].) We further note that reversal in such a case, where Mother has failed to meet her burden to show changed circumstances, "would unnecessarily undermine 'the strong public interest in prompt resolution of [dependency] cases so that the child[] may receive loving and secure home environments as soon as reasonably possible. [Citations.]' [Citation.]" (*In re M.P.* (2013) 217 Cal.App.4th 441, 459.)

Mother provided evidence that she had successfully participated in programs since January 23, 2013. However, there is no doubt that Mother's years of drug abuse and instability were very grave problems. (See *In re Kimberly F.* (1997) 56 Cal.App.4th 519, 531, fn. 9 [noting that the consumption of illegal drugs presents a far more grave problem than an unsanitary house in considering the denial of a section 388 petition].) In addition, although Mother presented evidence regarding the strength of her bond with Daniella, the record indicated that Daniella also was bonded with her grandparents and happy in her placement with them. (See *A.A.*, *supra*, 203 Cal.App.4th at p. 612 [one factor to consider in evaluating a section 388 petition is the strength of the relative bonds between the child and the parent and caretakers].)

Moreover, because of the gravity of Mother's problems, they are not "easily removed or ameliorated." (*A.A.*, *supra*, 203 Cal.App.4th at p. 612.) As of March 2012, Mother had an unstable lifestyle, living with various friends without a home

of her own, and not participating in any programs. In late 2012, one year prior to the section 366.26 hearing, Mother was incarcerated and therefore did not have any visitation with Daniella.

Thus, taking into consideration the seriousness of Mother's drug abuse and unstable lifestyle, the strength of Daniella's bonds with Mother and Maternal Grandmother, and the degree to which Mother's problems cannot be easily ameliorated, we conclude that Mother failed to present a prima facie case of changed circumstances. (*A.A.*, *supra*, 203 Cal.App.4th at p. 612.) Although Mother presented evidence that she was addressing the issues that led to Daniella's removal from her custody, Mother did not present any evidence that moving Daniella would promote her best interest. Thus, any error in the lower court's reasoning was harmless.

II. *Due Process Rights*

Mother contends that the juvenile court denied her due process by failing to grant her a hearing on her section 388 petition. However, because she failed to make a prima facie showing of changed circumstances, due process did not require a hearing.

"'[I]f the liberally construed allegations of the petition do not make a prima facie showing of changed circumstances and that the proposed change would promote the best interests of the child, the court need not order a hearing on the petition. [Citations.] . . . .' [Citation.] [¶] The appellate court '"will not disturb [a] decision unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations]."'" [Citation.]" (*In re Mary G.* (2007) 151 Cal.App.4th 184, 205.) No such situation exists here.

13

III.    *Termination of Parental Rights*

Mother contends that the juvenile court erred in failing to apply the parent-child relationship exception found in section 366.26, subdivision (c)(1)(B)(i).[6]

"At a permanency plan hearing, the court may order one of three alternatives:  adoption, guardianship or long-term foster care.  [Citation.]  If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.  [Citations.]  [¶]  Once the court determines the child is likely to be adopted, the burden shifts to the parent to show that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1).  [Citations.]  Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'"  (*In re S.B.* (2008) 164 Cal.App.4th 289, 296-297.)

"The 'benefit' necessary to trigger this exception has been judicially construed to mean, 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.  In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive

---

[6]    DCFS contends that Mother forfeited the claim that the parental relationship exception applies because she failed to raise the exception in the juvenile court.  (See *In re Melvin A.* (2000) 82 Cal.App.4th 1243, 1249.)  We disagree.  The transcript clearly indicates that counsel for DCFS, the child, and Mother all addressed the question, and that the juvenile court decided the question.

emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.' [Citations.]"  (*In re J.C.* (2014) 226 Cal.App.4th 503, 528-529 (*J.C.*).)

"There is some dispute about the precise standard of review that applies to an appellate challenge to a juvenile court ruling rejecting a claim that one of the adoption exceptions applies."  (*In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314 (*Bailey*).)  *Bailey* held that both the substantial evidence and the abuse of discretion standards of review apply to the review of an adoption exception.  (*Ibid.*)  The court reasoned that the juvenile court's determination that parent has produced evidence of the existence of a beneficial parental or sibling relationship is a factual issue subject to the substantial evidence standard of review.  (*Ibid.*)  However, the juvenile court's finding that the existence of that relationship constitutes a "compelling reason for determining that termination would be detrimental," (§ 366.26, subd. (B)) is "a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption.  [Citation.]"  (*Id.* at p. 1315.)

Mother contends that termination of her parental rights would be detrimental to Daniella because Mother has maintained regular visitation and contact with her, and Daniella would benefit from continuing the relationship.  The juvenile court found that Mother failed to meet her burden of establishing that she maintained regular visitation and contact with Daniella.

Mother and Maternal Grandmother both testified that Mother visited Daniella four times a week and stayed for most of the day when she visited. Maternal Grandmother conceded that Mother had a very good relationship with Daniella because of the quality time she devoted to the child.  However, the record

15

also shows that Mother was unable to visit Daniella during her six-month incarceration, which ended on December 21, 2012. Prior to her incarceration, Mother's visitation was inconsistent, and Mother occasionally failed to follow through with meetings with the caseworker regarding visitation.[7] The juvenile court's finding that Mother failed to establish regular visitation accordingly is supported by substantial evidence.

Even if Mother established regular visitation and contact with Daniella, she further must establish that continuing the relationship would outweigh the well-being Daniella would gain in a permanent home. (See *J.C.*, *supra*, 226 Cal.App.4th at p. 528.) The court reasoned that Daniella was only four years old and needed permanency in her life. In addition, the court pointed out that, only one month prior to the hearing, Mother indicated that she wanted Daniella to be adopted by her grandparents.[8] The court further reasoned that Maternal Grandmother had been Daniella's primary caretaker and provided her with a stable home for several years. The court's determination that Mother's relationship with Daniella was outweighed by the benefit to Daniella of adoption was not an abuse of discretion. (*Bailey*, *supra*, 189 Cal.App.4th at p. 1315.)

In order to establish that the parental relationship exception applies, "[a] parent must show more than frequent and loving contact or pleasant visits. [Citation.]" (*In re C.F.* (2011) 193 Cal.App.4th 549, 555.) Although Mother presented evidence of a good relationship between her and Daniella, there is no

---

[7] A July 2012 report stated that Mother "did not call much" after her release from prison, visited twice a week in February, did not visit at all in April, and visited regularly in May and June.

[8] The September 23, 2013 status review report, submitted one month prior to the section 366.26 hearing, stated that, although Mother "has made progress with her lifestyle, she continues to agree with the adoption plan."

evidence that a continued relationship with Mother would promote the well-being of Daniella sufficiently to outweigh the well-being she would gain in a permanent home with Maternal Grandmother. Mother therefore has failed to meet her burden of showing that termination of parental rights would be detrimental to the child under section 366.26, subdivision (c)(1)(B)(i).

**DISPOSITION**

The order appealed from is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

WILLHITE, Acting P. J.

We concur:

MANELLA, J.

EDMON, J.*

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.